Good morning. May it please the Court. Alexander Robbins on behalf of the United States. And I would like to try to reserve five minutes of my time for rebuttal, but I will watch my own clock. Unless the Court wants to further discuss the jurisdictional issue, which I realize we have hashed out quite a bit in the papers, I'm happy to turn to the merits of this case. I'll start there. On the merits, Your Honor, being a left-wing extremist does not give one the right to burn a police car, nor for that matter to attack people physically in a protest, nor does being a right-wing extremist, because the First Amendment does not protect violence. It doesn't confer some sort of immunity from prosecution because the motives for your violent crime were political. And I think fundamentally that is the fundamental legal error that the District Court made in both prongs of the selective prosecution analysis was that the District Court thought that there was something suspect or constitutionally suspicious about the Attorney General's memorandum directing the Department of Justice to prioritize prosecution of politically motivated violence in the summer of 2020. And the memorandum, the bar memorandum that we set forth in our brief, it's two pages, very clearly distinguishes between rioting and violence on one hand and protest on the other. It was the District Court that failed to make that distinction. It was the District Court, especially on pages 26 to 28 of the executive record, that repeatedly conflated rioting and violence with First Amendment-protected activity. And that mistake infected both prongs of the district analysis. It made the District Court think that there was something suspicious about the federal government directing cross-controlled resources towards prosecuting violent, politically motivated crime at a time when it was widespread. And, therefore, compare, use the wrong kind of graph.  Well, I think the defendants asked the District Court for an opportunity to evaluate whether there was selective prosecution or not. This isn't the District Court acting on his own because he disliked the bar memo. This is a motion, if I recall, you can tell me if I'm wrong, by the defendants to say, we need to, as part of our defense, we'd like an opportunity to explore the idea that we've been singled out unfairly. And selective prosecution, you can't do, you know that. So what was wrong with that? I'm a little put off by you suggesting this with the District Court looking with a jaundiced eye. This was a motion by defendants for their own defense. We are attacking the District Court's order and not the defense motion because the reason we're here is the District Court adopted the defense reasoning and granted that order. But, yes, of course, Your Honor, the defendants asked for a shelling for dismissal and for discovery on a shelling that was woefully short of what the Supreme Court required in Armstrong as to both discriminatory effect and discriminatory intent. On discriminatory effect, it seems like it comes down to how do you define the control group. So I'm curious, what's the government's position in terms of what's the proper control group here? The control group as a factual matter, and I think on the facts of this case, I'm not sure there is one, which would put it under Aguilar, which says if there's no comparably situated person, then the claim fails. But I think, as we point out in our brief, a possible control group might be a substantially similar individual burning a police car in a riot with a comparable criminal history who was not selected for prosecution where the only difference is some sort of protective First Amendment activity. That's the case in Steele. The only case that the defendants have that's remotely comparable that would support their argument here. And that's also what the Supreme Court described in, I think it was Waite, where the Supreme Court said you have to take out all of the legitimate prosecutorial considerations extraneous to the First Amendment activity, and that's your control group. So I guess I'm struggling a little bit with that proposed control group because if you narrowed it down to arsons that occur in the context of a protest, how could you ever know whether prosecution was being targeted towards First Amendment activity because you would theoretically always have First Amendment activity at issue within that control group. So wouldn't you need to define it some other way? Well, you would never know because it didn't happen. I understand that we're talking about hypotheticals. The government doesn't think that the district court did a close enough analysis of the control group. And so I'm trying to figure out how would you analyze it? Like what is the proper control group that the district court should have focused on? The example we offered in our brief was anti-lockdown COVID protesters. Had they been rioting and burning things in the summer of 2020, we offered that example because the district court seemed to think that that was somehow relevant. If you look at the last item of its discovery, of discovery demands, the defendants sought, and the district court granted wide-ranging discovery to the department's treatment of anti-COVID lockdown protesters. So had there been some sort of right-wing or different politically distinct rioting around the same time period, that would at least be a starting point to then look and see whether there were legitimate distinctions between the individual defendants in our hypothetical anti-COVID lockdown riots and the riots in this case in the summer of 2020, including in Santa Monica. That would be at least a plausible group. Now again, you still shouldn't operate at the level of groups. The Supreme Court's case law, Armstrong, Bass, Waite, very clearly require an individual analysis. So even then, you would still have to look closer and look at individual to individual comparison. That's an issue in the related case, the Rondo case that we cited as one of those related cases. But at the very least, you would need two groups that were comparable, and then you could take a further step and look and see if an individual was being treated differently. And I think the fact that we can't come up with one just shows how far afield the district court's order was here from anything resembling a successful selective prosecution claim, at least at Armstrong. Is there anything in the record that tells us whether the control group that the district court actually used included arsons that were not federally prosecuted that arose in the context of a protest? No, there's not. The aggregate data that the district court relied on, I think from just Internet sources and Department of Justice and other statistics about prosecution, had no information about riots, politically motivated violence, or anything of the sort. It was just completely aggregate data, precisely of the sort that the Supreme Court in Bass and Armstrong said that you can't rely on. So can I ask, is it a technical matter? The district court found that information by itself? The parties didn't present that? The defense presented that. Oh, I see. The defense presented it, and the district court adopted it almost entirely. The defense statistics and argument on that point. My name suggests that the district court came up with this on its own. Yeah, that's right. There was a lengthy defense argument citing the very same statistics, and the district court agreed with that argument. So we have this universe, this number of arsons that possibly could have been prosecuted federally and weren't, and we don't really know any more detail about the cases beyond that.  And as you point out, it's – If I could just jump in, sorry. Short of getting discovery from the decision maker, in this case the U.S. Attorney's Office, who has all the data, okay, you'll say you can't get that, you have no discovery rights as a defendant. How is a defendant, in your view, ever going to establish the grounds for a selective prosecution claim? They don't know what the U.S. Attorney has declined to prosecute. That's knowledge unique to the prosecutors. So the way you're – what I'm concerned about, I don't see how a selective prosecution defense, which is a valid defense, could ever be exercised meaningfully in the absence of evidence from the government. Your Honor, I would refer the court to pages 12 to 14 of our opening brief that sets forth across three pages the discovery demands in this case, which were not in any way so limited as the Honor describes. Certainly they ask for charging decisions, but there was a lot more. The discovery demands in this case are vastly overbroad, and not something the defense even attempts to defend on the merits of their answering brief. But on the case of, I guess, going back to Armstrong, in Armstrong you had a situation where all the defendants selected for prosecution were black. You had a situation where the statistics were far more favorable to the defense than here. And even then, the Supreme Court said that you need to have a substantial showing, or as this court put it in Sellers, something fairly close to the actual merits showing, of discriminatory selective prosecution based on race or political opinion before you get discovery. Because of the unique separation of powers concerns at issue here in a case like this, where you have the judiciary essentially constitutionally second-guessing discretionary determinations by the executive to take care that laws be faithfully enforced. And as a front in your brief, you compared this to the January 6th prosecutions and the selective prosecution claims there. Do you know if any judge in one of those cases ordered discovery? No, Your Honor. No judge ordered discovery in those cases. And we cite it, not so much to compare, say this is the same as that, but to illustrate the correct analysis that even in the context of the January 6th prosecutions, where you had a district judge who put on the record, Judge McFadden, in the judge case that we cite in the brief, disagreed at length with the department's policy sort of prioritization of prosecuting the January 6th rioters over the Portland Pioneer Courthouse rioters. He disagreed strongly with that decision as a policy matter, but he understood correctly that the claim of selective prosecution there still fell short, even of the discovery showing required by Armstrong, because of the executive's duty to decide where to prioritize federal prosecutorial resources and because of the fact that the district courts really are not well-situated as a practical matter to make these kind of determinations. And the fact that we are here in a case with another mirror image case coming up next month where we're being attacked by a different district judge for essentially the opposite thing is a good practical illustration of what Judge McFadden in the judge case understood, which is the Department of Justice needs to have and has constitutionally the authority to make discretionary determinations about who to prosecute. And unless we violate the Constitution somehow, that's allowed. My second question, in Steele there was two conducts at issue. One was, you know, the census, I think Bernie, what did they do, put in the card an anti-census speech. So there's two separate incidences, and that was why we were able to have the control group. What would be the two conducts here in this case? You know, there's a burning of the police car, and what's the else? I apologize, I might have misheard you, Your Honor, but in Steele there was no burning, Steele was nonviolent. The point that they have in brief is that in Steele the census protesters did not burn the census taker's car. They simply refused to fill out the census. But Steele is a perfect example of, I think, the correct analysis here as updated by weight. So Steele and weight really quickly, and then I'll sit back down and save my time for rebuttal. Steele involves a case where the defendants, according to this court, were prosecuted for stripping leaflets, leading marches, going on the radio, for actually separate protective First Amendment activity on the discriminatory intent prompt. Weight comes along a couple years later, and in that case you had draft refusings, people refusing to register for the draft. So we get those cases, but what was the separate protected conduct in this case? Oh, none. And that's why there was zero on the discriminatory intent prompt. You had an imputed anti-government views. Is it just purely from the arson itself, or is there something else? The defense motion, as Judge Notto pointed out in the district court's decision, inferred the imputed anti-government views entirely from the act of burning a police car in a riot itself. So there is no protected separate free speech conduct, as there was in Steele. So you're skipping over the context, right? They're present in the context of a protest activity, which has First Amendment implications. Correct. So just being there and being part of that movement is the only sort of second thing the judgment is asking about, right? That's correct, Your Honor, but it's not protected. I think that goes to my point about weight, comparing Steele to weight. In Steele, you had separate protected protest activity. In weight, the only expressive activity was people refusing to register for the draft. In letters, they were sending the president or the Department of Defense saying, I refuse to register for the draft. And weight talks about how you can consider expressive activity in the context that they crime when the protected activity and the non-protected activity are necessarily intertwined or inextricably intertwined. Steele involved a separate activity. Weight involved people who were just announcing their willful refusal to register in the course of doing so and sending letters to the government. They were wrapped up together, and I think that's more like this case, where the expressive conduct, the only expressive conduct at issue, as Your Honor pointed out, is showing up at a protest or a riot and burning a police car. With that, I will say the remaining comments. Your Honor, before you sit down, just one last question. Earlier, you thought the discovery requests were overbroad. Is there any portion of the request that you think might have gone forward without a problem? We did not attempt to sort of apply the Davis at Seventh Circuit and Davis sort of takes a scalpel to similarly broad discovery requests and cuts, for instance, some of these might go to a selective enforcement claim, which under this Court's decision, Sellers agreeing with Davis is subject to a different standard. We didn't do that because the defense wasn't making a selective enforcement claim. This is only a selective prosecution claim. So we did not do that sort of Davis-Sellers analysis to try to partial out selective enforcement type items that might be subject to a lower standard. If this, for some reason, who knows, went back to the district court, that would still be a question the judge could address, right? I think the judge would have to address in the first instance whether it's waived or here on a selective prosecution claim, not a selective enforcement claim, which as this Court has explained in Sellers is a very different thing. The defense simply hasn't made that claim. So we have no way of knowing. I don't want to prejudge how that would shake out in the district court. Thank you. I will give you some time for rebuttal. Good morning, Your Honors, and may it please the Court. So I appreciate the Court's focus order, and I would like to speak about jurisdiction, if that's okay. But just quickly before I forget, because I think there's an important point I wanted to make. So my friend said that essentially the data that the district court relied on was this mass aggregate data, and there was no further specificity to it. So I actually went back through the data in the ER, and I found at least five instances of police facility arsons, and that's at 2ER, 180, 190, 193, 234, 237. There are also tons of examples of schools, libraries, vehicles, hotels, churches, all the sort of thing that you would expect affects interstate commerce or has some jurisdictional hook for the federal government. Does that data give us any indication of whether any of those incidents were connected to protest activity of any sort? Not that I'm aware of, Your Honor. Why doesn't that matter? It would be helpful for sure. I agree with Your Honor. And I think part of the problem, as Judge Genato was talking about, is we can only really rely on public data. And so there's only so much that's out there in the public record. And I didn't want to go onto Google and try to find examples to bring in from outside of the record. So, you know, if that's a concern for Your Honor, I think it's important. That's the problem. It's just kind of all on feelings here, right, that there's a feeling that the government might have done this, but there's really not much to prove it. Your Honor, I think, again, part of the problem is we don't have access to the material that would prove it conclusively. And, again, we're not here to prove it on the merits. So the posture we're in is just about discovery. And under Armstrong, the standard is some evidence. And so I think — Your Honor, I mean, I'm struggling a little bit with the argument that you're making in this case because of Armstrong. I mean, because there's a statement in Armstrong that says that the standard for showing selective prosecution is a demanding one. And then with regard to discovery, it specifically says that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims. Recognizing that that standard for even getting the discovery is also hard, and it's borne by the defense. And so I get the thought, you know, like we don't have the primary access to the information, but the Supreme Court didn't seem to create a safety valve for that. I understand, Your Honor. And I don't try to run away from that in our brief. I agree it is a high standard. But we also have this court's decision in Arenas-Ortiz, which says that it's somewhat less demanding. And just as a matter of logic, it has to be something less than the merits. Otherwise, what's the point of allowing discovery into this at all? There would be no discovery. And I think, plausibly, the Supreme Court might have just said, no discovery at all. You just have to come forward and prove the merits. One other point is like — Do you know how they figured it out in Steele, which is the one we said can go forward? I don't, Your Honor. That was a pretty old case, so I'm not entirely sure. And I don't want to mislead the court. But one other point about Armstrong. So I could be wrong here, but I'm pretty sure that Armstrong was just about the discriminatory effect prong and not discriminatory intent prong. And so there's a footnote in Armstrong. It's footnote 3 at page 469, where the court seems to suggest that it's possible, just on a discriminatory intent showing alone, to obtain discovery. The court doesn't adopt that. And I just want to be clear, I'm not saying that that is law. But there is then a decision of this court, Sellers, and that's at 856, note 11, where this court recognizes that possibility as well. So I think here we have both prongs. And I think the evidence on discriminatory intent, you know, is pretty strong. I think it's fairly candid, some of the statements we have from the decision-makers. And, you know, that's an interesting point. I mean, I think you're right, there was discriminatory intent, but it was towards anti-government extremists that are violent. And why is that a protected class in any sort of way? So I understand it's a much closer call with a violent anti-government extremist, as laid out in the Barr memo. So if it's true there was discrimination against anti-government violent extremists, so what? Sure, Your Honor. And I just want to be clear that I don't think that's not the classification that we're alleging here. And I understand that perhaps the task force memo, it's a very well-crafted document. I'm sure DOJ lawyers put it together. You know, it's sanitized. It's very clear about saying violence because it knows that First Amendment rights are implicated. But there are also other statements. So we have candid and sort of seemingly off-the-cuff type statements from the former president and the former attorney general. And there are a few that kind of stuck out to me as I was re-reviewing everything. There was a specific reference. You agree with me that the government can have discriminatory intent against anti-government violent extremists, right? I think it depends on the context, but I could see a situation where that's correct. Yeah, I understand what Your Honor is saying. But I want to just pivot to the other statement. You're just saying that that's not the discriminatory group or the arbitrary classification. Exactly, exactly. And, again, I want to make sure that I do get to your station because I think that's a really interesting issue and I would love to talk about it with you. But I just want to mention some of these statements. So you have the former president specifically isolating the L.A. protests. And all these statements, by the way, they're at 1 ER 28-29. They're in the district court's order. He says he wants total domination. He says there should be no system where there should be no lenient appeals of some hypothetical deal where somebody gets out of jail in a week. He says he wants violent protests. The last thing I'm going to have to do is prove that he's talking about the peaceful side of that protest in L.A. Is there any evidence of that? Well, Your Honor, all I can give you are the public statements because, again, this is the we did our best with the public record. Everything else is in the hands of the government. And I do think it's quite extraordinary for a sitting president to say that he wants to do retribution with the legal system. So it's possible to, like, again, if it's against a violent anti-government excuse, so what? Understood, Your Honor. The district court didn't interpret the fact that way. So, again, we're here reviewing the discovery order and that's a piece of discretion standard. If I may just jump in, I think for me the key word is who is the extremist. And I think what you're saying is the government should not have untrammeled discretion to say someone whose viewpoint they don't like is an extremist, violence included, whereas someone whose viewpoint they do like is not an extremist, violence included. I mean, to me, that's what you're saying is the Selective Prosecution Corps. Yes, Your Honor, you said it much more eloquently than I did. This case wasn't extremist on both sides of the political spectrum, so this was not an ideological problem. I'm not aware of anyone on the other side of the political spectrum at this protest, I think. It wasn't one of them. Bougaloo Boo, which is considered extreme right wing, and then Beasley was more left wing. I think at this stage in the case, it's hard to say what their precise ideologies were. I think there were statements from Beasley that may be construed as anti-police officer or anti-law enforcement, and I think the same might be true of Mr. Wilson. But the record is so sparse at this point that we just really don't need one of the kill liberals. I think that's in the record, Your Honor, yes, in an Instagram post or some social media post. But beyond that, we really don't know what Mr. Wilson's political ideologies are. I closely help believe that. You're arguing that the government is targeting left wing extremists versus right wing extremists, right? Not in this case. I think the other case that my friend referred to, Rundo, is one where it's much more clear. It occurred in, I think, 2017 at a bunch of political rallies, and there were protesters and counter-protesters from each side, and I can understand why that's a much cleaner comparison group. But I think here the classification is not simply left wing or radical left. It's people who hold anti-government views and who are attending this particular protest or series of protests related to George Floyd's death. Can I just ask, what do you think is the protected First Amendment activity, in this case, by your clients? I think Judge Forrest actually hit on it, and I'm probably not going to say it as well as she did, but they were at this rally. I think there was some evidence in the record that Mr. Wilson went to the protest to see what was going on. There was some evidence that Mr. Beasley traveled across the state to go to protests. So I think it's the association with the core First Amendment right to protest, and it's the proximity to the protest. That's important. And the proper control would be those other protesters who didn't, didn't any other protesters get arrested and be charged federally? There were other cases, Your Honor. There were the Alvarado case, the Tillman case, and those were both people who I think were alleged to have committed arson at a restaurant. So protesters plus arson. Yeah. Why should it be protesters plus arson? Exactly. And I think in order to, so the purpose of the control group, as I'm sure Your Honors are aware, is to isolate this factor that cannot be discriminated on, the basis that cannot be, so it's a factor for discrimination. So if we're just looking at people who are at the protest, which is what the government proposed below, we wouldn't be able to isolate that out. So that's why I think in the absence of, you know, discovery, the trial attorneys in this case tried to collect as much public data as they could of arsons that occurred in the central district of California. And they were able to show, and again, I looked through the data myself. I know it's a lot, but the district court stated in his order that he reviewed everything, and I take him at face value on that. So we're supposed to take, like, the example you're giving, you know, vehicle, passenger, truck arson. That's our control group. I think you could look at police facility arsons, and that would be a really clean control group for allegedly burning a police car in Santa Monica. So, okay, and just to be clear, I want to make sure I say this again, because I know we are very concerned about the merits, and I think rightfully so, but we're still at the discovery stage here. And the district court looked at these statements of discriminatory intent. The district court found that they showed some discriminatory intent. The government never raised evidentiary objections to those particular statements, nor did they even dispute the meaning. So I think it's hard for me to see how you can fault the district court for considering those statements. And if it's okay with the court, I'd really love to talk about jurisdiction. I have this whole spiel ready for you guys, but I only have about three and a half minutes left. So I think, of course, you know, we have to consider Davis. These are judges who report the opinion. It's a nice opinion. It's very persuasive, but I ultimately think it's wrong. But the first, and just because I'm running on time, I think I just have to say this, that it would be helpful for the court. I'd love the opportunity to present a supplemental brief on Davis. We don't have enough time to get through it, but because it wasn't addressed in the briefing, I'll do my best to talk about it in the time I have left. So the first point is, obviously, everyone knows this Davis is not an answer case, so it's not controlling here. This court has the freedom and discretion to ask the question of its own accord. But more fundamentally, I think Davis gets the textual analysis wrong. I think Davis also, the limitation, it relies on heavily district court discretion. It also gets that wrong. That's not a sufficient limitation. And that's not even something that we consider sufficient in civil cases. So in an interlocutory appeal under 1292B, there are a whole host of limitations. You have to show that it's controlling. If I could just jump into it. So Davis, as I read it, says Section 3731 just is completely divorced from the finality requirement of 1291. In other words, Congress said, in this case, we're not worried about finality. We're only worried about double jeopardy. And we actually have a case that, in fact, from 1973, different context, it was with prejudice for the dismissal. But it all turns on double jeopardy, and Congress's view that for double jeopardy, government can appeal. And we have jurisdiction for that. But why is that wrong? So I think that's potentially right with respect to orders that are actually adverse to the government and that have to do with some substantive procedural or technical defect in the indictment. But I just don't see how you can get that reading out of the text for something like we have here for discovery orders. And I want to make sure I answer the Court's question. I think there are two really strong counterarguments there. One is this issue of the invited nature of the dismissal. So, like, in other words, the government's not really aggrieved by a remedy that they requested. And, two, that there's some jurisdictional manipulation here. And I think the en banc decision in Armstrong, which, of course, was reversed by the Supreme Court on other grounds. But I think that case at page 1510 really embodies this point. But just to quickly go back to the text, I think, first of all, we have to remember that there's this background presumption we're dealing with. The government has no right to appeal in criminal cases. In order to do so, it needs an express or explicit congressional authorization. And the Supreme Court has said that we need to strictly construe jurisdictional statutes against the government's right to appeal. That doesn't appear anywhere in Davis. So the next point is, oh, I'm sorry, but I think Section 3731 says it's to be liberally construed. Well, it does, Your Honor, of course. But that doesn't tell us how far we should construe it. And I think what the government's essentially saying here is that you should construe the word dismissal to mean discovery or mean any pretrial order without any limitation. And I think … Well, I don't know if you can say that because, in this case, the district court agreed and dismissed the indictment. And so the plain text of 3731, which says jurisdiction exists for the government to appeal if an indictment is dismissed, doesn't tell us that we need to parse that out. We just look, did the district court dismiss the indictment? And here, he did. And I agree with that, Your Honor. He did dismiss the indictment. I don't think the district court gave genuine or meaningful consideration to the nature of the sanction it was imposing. The government proposed this. And, you know, with all due respect, I think the district court went along with it but should have required at least a little more briefing, should have at least held a contempt hearing. But 3731 tells us that we need to look at those things. Well, can I give you an example, Your Honor, just to make a point? So I was thinking about, you know, just contextual arguments. And obviously, we all know that surplusage canon. And so I think if we adopt the government's interpretation of the statute here, what it essentially does is render the rest of the statute, so paragraphs 2, 3, and 4, they're not numbered or lettered, they're just there, they would render it meaningless. So, for example, in paragraph 2, in order to appeal a suppression order, an exclusion order, an order about the return of seized property, the government needs to certify to the district court that it's not for delay. And there's some proof of it's evidence that's substantial proof of material fact. So if we were to adopt the government's view in this case, what it could do in another case, where it, for whatever reason, couldn't make that certification, all it would have to do is just ask the district court to dismiss the indictment. And nothing like the district court is just this, you know, push over. The district court will make an independent decision and decide whether or not to dismiss. And I apologize if that's what it sounds like I'm saying. I'm not saying that at all. But what I do recognize, and I think this court's decisions recognize in other contexts, for example, in the sentencing context, is that when the government asks for something, it's taken very seriously by the district court. And rightly so. But to ask, did you oppose dismissal? Yes. You did? Yes. And also, like I was trying to say earlier, I don't think I fully got this out, but even under a 1292B appeal, there are several standards that Congress sets forth that it requires the district court to find before it certifies. And then even when it certifies, the court of appeals can still say no. All right. Cancel. Do my colleagues have any other questions? No, no. Thank you. Thank you for your argument. Hello again, Your Honors. If I could maybe offer the court three helpful citations on the jurisdictional issue. On ER 58 is where the government asks for dismissal as an alternate remedy if the district court continues to adhere to its, in our view, mistaken original order. And compare that to Armstrong footnote 2 at 461 and the Supreme Court case of Wait at 604. In both cases, the government did the exact same thing, and the Supreme Court laid that out and didn't seem to have understood 371 means what it says and gives the courts of appeals jurisdiction over orders dismissing an indictment. To turn back to the merits, I'd like to point this court to two, I think, relevant helpful parts of the Aguilar decision cited in our brief. At 706, the Aguilar court says that the control group and the defendant must be the same in all relevant respects except that the defendant was, for instance, exercising his First Amendment rights. And then it goes on to say later on that page that if there is no one to whom the defendant could be compared in order to resolve the question of selection, it follows that the defendant has failed to make out one of the elements of its case. The fact that there is no control group on the facts of this case doesn't help the defendant. It hurts him. What do you do with defense's argument that says that there's, if not binding us already, at least some indication in the case law that you could make it just on a showing of discriminatory intent? I think, first, I think that's contrary to Turner and Armstrong, which I guess weight as well. All the Supreme Court cases and this court's cases say that they're two separate requirements, both of which must be shown. I also think that as I think discriminatory intent is completely absent here for the reasons that we've addressed earlier, because violent anti-government extremist organizations or individuals who are committing crime and it's politically motivated are not in any way a suspect class. To the contrary, it was the district court that tried to infer discriminatory intent, largely from its incorrect disparate impact discriminatory treatment data, which, again, fails for some reasons. The district court, I think, was the targeted group here. The district court, I prefer the honor to pages 26 and 27. The district court seemed to think the targeted group was George Floyd protesters and repeatedly conflated George Floyd protesters with rioters, like the two defendants in this case. So, I wonder, I mean, I wonder if something you just said is a little too broad. If you had, like the summer of 2020, sort of counter-protests going on. I was in Portland. I saw those pretty close and up front. So, those protests were going on. You had sort of clashing interests at some times and sort of like different political ideologies. If you had a situation where it was very clear that only one side of that ideology, ideological split, was getting prosecuted, even though both sides were engaging in the same kind of unlawful conduct, don't you think that you could make a showing for selective prosecution? Yes, I think you could. Even though both sides are engaging in unlawful conduct. I think you could, yes, and that would fall comfortably within Steele, because, again, as a hypothetical, if that were to happen, you would be able to find, point to, as was the case in Steele, you would be able to point to an individual who was beating someone over the head in a protest on one side, who was prosecuted, and a comparably situated individual on the other side who wasn't prosecuted. And, you know, they would be, because we have listed some factors in our brief, legitimate prosecutorial decisions. You have to look at criminal history. You have to look how well organized the group is. There are all kinds of factors that go into this. But, in your hypothetical, Your Honor, you would have comparably situated individuals. Some of whom are being prosecuted, some of whom are not. You don't have anything close to that in this case. And then, of course, you'd also need intent as well. All right. Do we have any further questions? Okay. So is it true that one of them is left-wing and one of them is right-wing? Is that a wrong way to consider this? The district court and the defense proceeded on the assumption, as an imputed theory, that they were sort of left-wing or at least anti-government views imputed to both of them. That was the basis of the defense motion, the district's decision. As we pointed out in our brief, as a factual matter, it's unclear exactly what their views were, to the extent that they had any, which just goes to the fact that there wasn't really any separate viewpoint discrimination that even could have been operational here. The defense theory is that it's an imputed, discriminatory thesis. And so we're addressing that. It doesn't happen a lot that you can have an imputed belief that is the motivation for discriminatory action. Exactly. So that's the defense theory is one of them, imputed political belief. And then we're sort of responding to that. We pointed out in our brief that it's very far from clear that that's even correct or close to correct. All right. Mr. Leonard, do you have any further questions? Since there are many, thank you. All right. Thank you. All right. Thank you both for the argument. In the United States v. Wilson and Beasley, that case is submitted.
judges: FORREST, BUMATAY, Donato